Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Counsel for Plaintiff Panjwani

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SALMAN PANJWANI, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br>vs.<br><br>MOBILEIRON, INC., ROBERT TINKER, AND TODD FORD,<br><br>Defendants. | CASE No.:<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Plaintiff Salman Panjwani, individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's Complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by MobileIron, Inc. ("MobileIron" or the "Company"), as well as media and reports about the Company. Plaintiff believes

that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities, other than defendants, who purchased the securities of MobileIron during the period of February 13, 2015 through April 22, 2015, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class").

2. MobileIron provides a purpose-built mobile IT platform that enables companies to secure and manage mobile applications, content, and devices while providing their employees with device choice, privacy, and a native user experience. MobileIron's goal is to provide the foundation for companies throughout the world to transform into mobile first companies.

## JURISDICTION AND VENUE

3. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78b-1 and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

4. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

5. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred. Defendant MobileIron maintains its

headquarters and conducts business in this District.

6. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

7. Plaintiff Salman Panjwani, as set forth in the accompanying certification incorporated by reference herein, purchased securities of MobileIron during the Class Period and has been damaged thereby.

8. Defendant MobileIron is organized under the laws of Delaware and headquartered in Mountain View, California. The Company's common stock is listed on NASDAQ, an efficient market, under the ticker symbol "MOBL."

9. Defendant Robert Tinker ("Tinker") is, and was throughout the Class Period, MobileIron's Chief Executive Officer ("CEO") and President.

10. Defendant Todd Ford ("Ford") is, and was throughout the Class Period, MobileIron's Chief Financial Officer ("CFO").

11. Defendants Tinker and Ford are collectively are referred to herein as the "Individual Defendants." MobileIron and the Individual Defendants are referred to herein, collectively, as "Defendants."

12. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(f) approved or ratified these statements in violation of the federal securities laws.

13. As officers, directors, and controlling persons of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Exchange Act, and was traded on NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's business prospects and operations, and to correct any previously-issued statements that had become materially misleading or untrue to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

14. MobileIron is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

15. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to MobileIron under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

16. MobileIron's platform is composed of three integrated and distributed software components: (i) a mobile IT policy server, or Core, that allows IT

departments to define security and device management policies across popular mobile operating systems; (ii) software on the device, or Client, to enforce those policies at the mobile end-point; and (iii) an in-line intelligent gateway, or Sentry, that secures data as it moves between the device and back-end enterprise systems. The three components of the MobileIron platform work together to ensure end-to-end security for enterprise data by enforcing IT policies defined in Core on the data-at-rest via Client and data-in-motion with Sentry.

17. MobileIron derives revenue from the sales of the Company's software solutions to customers. Customers are able to purchase MobileIron's software solutions through either: (i) a perpetual licenses; or; (ii) a subscription on a monthly recurring contract ("MRC").

18. MobileIron also generates revenue from software support and services including upgrades, updates and technical support for customers who purchase a perpetual license.

19. Customers who purchase the subscription service from MobileIron usually purchase a one-year terms and the customers are billed in advance.

**Defendants' False and Misleading Class Period Statements**

20. On February 12, 2015 after the market closed, MobileIron issued a press release, "MobileIron Announces Fiscal Fourth Quarter and Full Year 2014 Financial Results," announcing its financial results for the fourth quarter of 2014 and full year 2014 as well as guidance for the first quarter of 2015. The press release states, in relevant part:

**Financial Outlook**

The company is providing the following outlook for its fiscal first quarter 2015 (ending March 31, 2015):

- Total billings are expected to be between $40 million and $42 million
- ***Total non-GAAP revenue is expected to be between $34 million and $37 million***, and GAAP revenue is expected to be between $34.8 million and $37.8 million
- Non-GAAP operating expenses are expected to be between $43.5 million and $44.5 million

The company is providing the following outlook for its fiscal year 2015 (ending December 31, 2015):

- Total billings are expected to be between $190 million and $200 million
- Total non-GAAP revenue is expected to be between $165 million and $175 million, and GAAP revenue is expected to be between $167 million and $177 million

Additionally, the company is providing the following outlook for its fiscal fourth quarter 2015 (ending December 31, 2015) and fiscal fourth quarter 2016 (ending December 31, 2016):

- Non-GAAP Operating Margin is expected to be between -18% and -22% for the fiscal fourth quarter of 2015
- Non-GAAP Operating Margin is expected to be between -8% and -12% for the fiscal fourth quarter of 2016
- Cash from Operations is expected to be positive for the fiscal fourth quarter of 2016.

(emphasis added).

21. On the same day, the Company held a conference call to discuss the financial results for the fourth quarter and full year of 2014 as well as the guidance for the first quarter of 2015. During this conference call, Defendant Ford reiterated the Company's revenue guidance for the first quarter of 2015 stating in relevant part:

> Now some comments and guidance for fiscal year 2015 and Q1. The market we are addressing is in its early stages and ***our strategy has been to focus landing customers in the medium to large business***

6
Class Action Complaint for Violation of the Federal Securities Laws

*segment, followed up with expand enough to order, the strategy is working.* Our recurring dollar base retention rate for 2014 was approximately 125%. Dollar based retention measured the total billings growth as our recurring business, the changes in subscription and software support of our customers 12 months prior to the current period net of customer churn. This is an important metric as it encapsulates several key factors of our business including customer retention and expansion, feature up sells and pricing trend. *As we work through 2015, we will continue to be aggressive to landing large global customer and we would like to expand within our current account base which we estimate at less than 25% penetrated at this point.* This matters because expansion into our current space creates significant growth opportunity and relatively lower incremental cost. *We continue to witness a shift from perpetual licenses to recurring subscription licenses in MRC, while we don't push customers towards any particular licensing model, we welcome the shift to subscription billing as we believe they have a higher long term value.* However, the timing of large transactions may cause some mix to shift in particular quarter. The mix shift does make it more difficult to forecast revenue.

Starting with Q1 guidance. And this is our first time recording on Q1 as a public company; I wanted to provide a few comments specific to Q1. Q1 is historically been a seasonally slower billing quarter for us, coinciding with enterprise budgetary cycle. Also in Q1 we typically have higher operating expense with sales pick up initiatives, reset of payroll tax expenses and hiring activity. *From this quarter, we are also seeing a substantially higher mix of subscription plus ratable billing driven by few large deals. Our guidance incorporates the resulting impact to billings and revenue.* For the first quarter, we expect billings to be in the range of $40 million to $42 million. Given the make shift in billing for Q1, we estimate that our recurring billing for Q1 will exceed 60%. *We are projecting a non-GAAP revenue range of $34 million to $37 million.*

\* \* \*

So we are not providing detailed mix for the entire year but let me provide some comments on Q1 in particular. *So in Q1 we are seeing a much pronounced shift from perpetual licenses to subscription*.

7
Class Action Complaint for Violation of the Federal Securities Laws

(emphasis added).

22. On February 27, 2015, the Company filed a Form 10-K with the SEC for the fiscal year ending December 31, 2014 ("2014 10-K"). The 2014 10-K discussed the shift in customers to purchasing subscription based services from perpetual license services. The 2014 10-K states in relevant part:

> ***In recent periods, an increasing portion of our sales has been generated from subscription, including MRC, licenses.***
>
> \* \* \*
>
> We derive revenue from sales of our software solutions to customers, which are sold either (i) on a perpetual license basis with annual software support when deployed on premise or (ii) on a subscription basis as a cloud service or when deployed on premise. The majority of our revenue to date has been sales of perpetual licenses of our platform and related annual software support, with ***the subscription revenue being an increasing portion of our revenue.*** Revenue from subscription and perpetual licenses represented approximately 23% and 50%, respectively, of total revenue in 2014. The balance, constituting 27% of total revenue in 2014, was software support and services revenue, including revenue from agreements to provide software upgrades and updates, as well as technical support, to customers with perpetual software licenses. When we sell our solutions on a subscription basis, we generally offer a one-year term and bill customers in advance. A portion of our revenues from service providers is based on active subscriptions on a monthly basis. We include this revenue in subscription revenue and refer to this revenue as monthly recurring charge, or MRC. ***We have experienced growth of MRC revenue each quarter since the first quarter of 2012.*** Our MRC revenue comprised approximately 9% and 6% of our total revenue in 2014 and 2013, respectively.

(emphasis added).

23. The true facts, which were known by Defendants but concealed from the investing public during the Class Period, were the unrealistic expectations of meeting first quarter of 2015 guidance due to not being able to close large

customers during the quarter and the continuing shift in MobileIron customers in utilizing the Company's subscription service rather than perpetual licenses.

24. As a result of the foregoing, Defendants had led the market to expect certain expectations that were unreasonable during the Class Period.

## The Truth Emerges

25. On April 22, 2015, after the market closed, the Company issued a press release entitled "MobileIron Announces Preliminary Financial Results for First Quarter of 2015" which lowered its revenue guidance for the first quarter of 2015. The press release states in relevant part:

> Gross billings for the quarter are expected to be in the range of $35.5-$37.0 million, below the company's guidance of $40.0-$42.0 million. Recurring billings as a percentage of gross billings increased from 57% in the fourth quarter of 2014 to approximately 65% in the first quarter of 2015. ***Total non-GAAP revenue is expected to be between $32.0-$33.0 million, compared to guidance of $34.0-$37.0 million.*** Non-GAAP revenue excludes perpetual license revenue recognized from licenses delivered prior to 2013. Cash from operations is expected to be in the range of negative $10.0 to $11.0 million. The company ended the quarter with cash and equivalents plus short-term and long-term investments of approximately $132.0 million.
>
> These preliminary, unaudited financial results are based on management's initial review of operations for the quarter ended March 31, 2015, and remain subject to change based on management's ongoing review of the first quarter results.
>
> "***Near the end of the quarter, we witnessed multiple large deals from North American customers that did not close as expected. Further, we saw a large shift by customers to our monthly subscription offering, which resulted in lower billings and revenue***." Said Bob Tinker, CEO, MobileIron. "We will provide more details on our regularly scheduled quarterly earnings conference call."

(emphasis added).

26. Defendants concealed the effect of the shift on revenue by stating in their February 12, 2015 conference call that the guidance already incorporated the shift's resulting impact to billings and revenue, even though Defendants knew that the shift would depress billings and revenue. It was only on April 22, 2015 that investors learned that the shift to monthly subscription services rendered the guidance unrealistic and unattainable because of the shift's negative short-term impact on billings and revenue, which Defendants failed to disclose.

27. On the same day, the Company issued another press release stating that Defendant Ford was resigning as MobileIron's CFO. Although the resignation was announced on April 22, 2015, the press release stated that Defendant Ford would be staying at MobileIron until the Form 10-Q was filed with the SEC for the first quarter of 2015.

28. On this news, shares of MobileIron fell $2.39 per share or over 25% from its previous closing price to close at $7.11 per share on April 23, 2015, damaging investors.

## ADDITIONAL SCIENTER ALLEGATIONS

29. As alleged herein, MobileIron and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding

MobileIron, their control over, and/or receipt and/or modification of MobileIron's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning MobileIron, participated in the fraudulent scheme alleged herein.

## NO SAFE HARBOR

30.     MobileIron's "Safe Harbor" warnings accompanying its reportedly forward looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

31.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of MobileIron who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## LOSS CAUSATION/ECONOMIC LOSS

32.     The market for MobileIron securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading

statements and omissions as set forth above, MobileIron securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired MobileIron securities relying upon the integrity of the market price of MobileIron securities and market information relating to MobileIron, and have been damaged thereby.

33. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of MobileIron securities and operated as a fraud or deceit on Class Period purchasers of MobileIron securities by misrepresenting the value of the Company's business and prospects by providing guidance figures that were unrealistic. As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of MobileIron securities fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of MobileIron securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.,* damages, under the federal securities laws.

34. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about MobileIron's business and operations. These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of MobileIron and its business and financial condition, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing MobileIron securities at artificially inflated prices, thus causing the damages

complained of herein. When the true facts about the Company were revealed to the market, the inflation in the price of MobileIron securities was removed and the price of MobileIron securities declined dramatically, causing losses to Plaintiff and the other members of the Class.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

35. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired MobileIron securities traded on NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

36. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, MobileIron securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by MobileIron or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

38. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

39. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of MobileIron;

- whether the Individual Defendants caused MobileIron to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of MobileIron securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

40. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

41. Plaintiff will rely, in part, upon the presumption of reliance established

by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- MobileIron securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold MobileIron securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

42. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

43. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

44. At all relevant times, the market for MobileIron's common stock was an efficient market for the following reasons, among others:

45. As a result of the foregoing, the market for MobileIron's common stock promptly digested current information regarding MobileIron from all publicly

available sources and reflected such information in MobileIron's stock price. Under these circumstances, all purchasers of MobileIron's common stock during the Class Period suffered similar injury through their purchase of MobileIron's common stock at artificially inflated prices, and a presumption of reliance applies.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

46. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

48. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of MobileIron securities during the Class Period.

49. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for MobileIron securities. Plaintiff and the Class would not have purchased MobileIron securities at

the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

50. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51. The Individual Defendants acted as controlling persons of MobileIron within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, and their ownership of MobileIron securities, the Individual Defendants had the power and authority to cause MobileIron to engage in the wrongful conduct complained of herein. MobileIron controlled the Individual Defendants and all of the Company's employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding rescission or a rescissory measure of damages; and

E. Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 1, 2015

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Counsel for Plaintiff Panjwani

Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against MobileIron, Inc.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The MobileIron, Inc.. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

| | |
|---|---|
| **First name:** | Salman |
| **Middle initial:** | |
| **Last name:** | Panjwani |
| **Address:** | |
| **City:** | |
| **State:** | |
| **Zip:** | |
| **Country:** | |
| **Facsimile:** | |
| **Phone:** | |
| **Email:** | |

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 01/06/15 | 1000 | 9.3799 |
| Common Stock | 02/13/15 | 100 | 8.8340 |
| Common Stock | 02/13/15 | 500 | 8.8360 |
| Common Stock | 02/13/15 | 355 | 8.8300 |
| Common Stock | 02/13/15 | 45 | 8.8100 |

**Certification for Salman Panjwani (cont.)**

Sales:

| Type of Security | Sale Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | Sell Date | # of Shares | Price per Share |

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate:     **YES**

By clicking on the button below, I intend to sign and execute this agreement and retain the Rosen Law Firm, P.A. to proceed on Plaintiff's behalf, on a contingent fee basis.     **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 04/27/2015