Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

***Counsel for Lead Plaintiff and the Class***

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SALMAN PANJWANI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br>vs.<br><br>MOBILEIRON, INC., ROBERT TINKER, and TODD FORD,<br><br>Defendants. | CASE NO.: 3:15-cv-01984-SC<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Dmitry Cherenshchikov, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based on the investigation conducted by and through his attorneys, that included, among other things, a review of Securities and Exchange Commission ("SEC") filings by MobileIron, Inc. ("MobileIron" or the "Company"), Company press releases, media and reports about the Company, and

interviews with former employees. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities, other than defendants, who purchased the securities of MobileIron during the period of February 13, 2015 through April 22, 2015, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class"). Lead Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its officers and/or directors and various persons who improperly announced to the investing public a revenue forecast for Q1 of 2015 which they knew significantly overstated the revenue that would actually be recognized during that quarter, thereby damaging investors in the company's stock who were unaware of the truth of MobileIron's finances.

2. In June of 2014 MobileIron had its Initial Public Offering. To that point, and indeed through today, MobileIron has never made a profit, or broken even. In the face of repeated quarterly deficits, it was important that MobileIron show increasing revenues to its investors, and meet its goals and the market's

expectations.

3. As the first quarter, 2015, began, it quickly became evident that assumptions Defendants made about customer behavior were not materializing on the ground, and that MobileIron's revenues would fall short.

4. The issues dampening first quarter revenue were evident to MobileIron's executives. Large customers were not re-upping, and it was clear that many would not renew their contracts or purchase additional services in the first quarter of 2015. All of this information was available to MobileIron's CEO and CFO through "Salesforce," the internal computer program used to track sales and sales opportunities. Further, at MobileIron's Global Sales Kickoff, held towards the end of January, 2015, and attended by all of MobileIron's executives and its entire sales force, news of the loss of large customers in Q1 was the talk of the conference.

5. Compounding this first quarter revenue problem – as Defendants knew – many customers, including large customers, were shifting from perpetual licenses to subscription services. This meant that MobileIron would recognize far less revenue in the first quarter, since with subscriptions revenues were recognized over the life of the contract. The Company, therefore, could only recognize a small fraction of the total contract in the first quarter, while with perpetual licenses it would have recognized the revenue from the annual fees for services, support and updates, in their entirety, up front. None of this was news to MobileIron or its

executive officers. MobileIron had repeatedly stated in documents filed with the SEC that the mix of customers had been shifting from perpetual to subscription even before the Company went public.

6. On February, 12, 2015, halfway through the first quarter, MobileIron held a conference call and issued a press release, issuing guidance for the first quarter of 2015. MobileIron admitted during the call that many customers, including large customers, were switching from perpetual to subscription services, with the resultant loss of recognizable first quarter revenue. It also admitted that large customers that it expected to sign or to renew their services during the first quarter had not signed or renewed their contracts. Despite the fact that events that had actually occurred and trends that were playing out in real time led inexorably to the conclusion that there was no way that MobileIron could meet its revenues forecast, MobileIron's CFO, Defendant Ford, told the assembled analysts that the Company had factored in what was occurring and that MobileIron would meet its revenue projection. Though this statement was without basis and ignored what was actually happening, MobileIron's forecast of solid revenues for the quarter had its desired effect. Analysts continued to recommend that investors buy MobileIron stock, and the stock price remained artificially inflated.

7. MobileIron could not avoid the reckoning it put off on February 12 when it issued its revenue forecast against all known evidence to the contrary. On April 22, 2015, having fallen significantly short of its revenue and billings forecast,

MobileIron had no choice but to reveal the dismal results of Q1 of 2015. The market reacted immediately. The next day, the price of MobileIron common stock fell by $2.39 per share to $7.11 per share – a decline of over 25% from its previous closing price – on relatively enormous volume of over 6.8 million shares traded, causing damage to investors.

## JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78b-1 and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

9. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

10. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District. Defendant MobileIron maintains its headquarters and conducts business in this District.

11. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

12. Lead Plaintiff Dmitry Cherenshchikov, as set forth in the certification filed with his motion for appointment as lead plaintiff, re-filed herewith and incorporated herein by reference, purchased securities of MobileIron during the Class Period and has been damaged thereby.

13. Defendant MobileIron is organized under the laws of Delaware and headquartered in Mountain View, California. The Company's common stock is listed on NASDAQ, an efficient market, under the ticker symbol "MOBL."

14. Defendant Robert Tinker ("Tinker") is, and was throughout the Class Period, MobileIron's Chief Executive Officer ("CEO") and President.

15. Defendant Todd Ford ("Ford") was, throughout the Class Period, MobileIron's Chief Financial Officer ("CFO").

16. Defendants Tinker and Ford are collectively referred to herein as the "Individual Defendants." MobileIron and the Individual Defendants are referred to herein, collectively, as "Defendants."

17. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was aware that the false and misleading statements were being issued concerning the Company; and

(f) approved or ratified these statements in violation of the federal securities laws.

18. As officers, directors, and controlling persons of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Exchange Act, and was traded on NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's business prospects and operations, and to correct any previously-issued statements that had become materially misleading or untrue so as to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

19. MobileIron is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment and with authorization.

20. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to MobileIron under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

21. According to MobileIron's Registration Statement on Form S-1, effective on June 12, 2014 ("Registration Statement" or "Prospectus"), the Company "invented a purpose-built mobile IT platform for enterprises to secure and manage mobile applications, content and devices while providing their employees with device choice, privacy and a native user experience." The Company's customers deploy its platform, replacing traditional computing platforms and "embracing mobility as a primary computing platform for their employees." The mobile first concept provides the Company's customers' employees with "secure access to critical business applications and content on devices employees want with a native user experience they love." The Company claims, too that its platform "fosters a growing ecosystem of application developers and technology partners who augment the functionality and add value to our platform, creating positive network effects for our customers, our ecosystem and our company."

22. MobileIron's platform provides three integrated and distributed software components: (i) a mobile IT policy server, or Core, that allows IT

departments to define security and device management policies across popular mobile operating systems; (ii) software on the device, or Client, to enforce those policies at the mobile end-point; and (iii) an in-line intelligent gateway, or Sentry, that secures data as it moves between the device and back-end enterprise systems. The three components of the MobileIron platform work together to ensure end-to-end security for enterprise data by enforcing IT policies defined in Core on the data-at-rest via Client and data-in-motion with Sentry.

23. The Company boasts that its "business model is based on winning new customers, expanding sales within existing customers, upselling new products and renewing subscriptions and software support agreements." The Company continued that it "win[s] customers using a sales force that works closely with our channel partners, including resellers, service providers and system integrators." Thus, not only does the Company sell products directly, but partners with resellers who sell its products and services to customers.

24. Since 2009, the Company claims that it has grown rapidly, installing its platform to over 6,000 customers. "Our strategy," the Company stated, "is based on our existing customers expanding the number of mobile device licenses or subscriptions purchased to facilitate their Mobile First journey." The Company supports that strategy by reference to "the 2010 Cohort," a group of 168 purchasers in 2010 who "subsequently purchased through December 31, 2013 over five times the initial number of mobile device licenses." According to the Company, it

"enhance[s] the value of our platform by introducing additional products and upselling these additional products to our customers." Upselling – selling more product and service to existing customers – has been and remains critical to the success of MobileIron's business model.

25. Defendants claim to "evaluate the profitability of a customer relationship over time." In general, MobileIron incurs the costs to acquire and implement its platform "up front, while gross billings tend to increase over time as customers purchase additional device licenses and renew their subscriptions and software support agreements, a customer relationship may be unprofitable early in the relationship, but profitable over the life of the relationship as revenue is recognized."

26. In terms of how customers purchase MobileIron's services, the Company claims, "[w]e offer our customers the flexibility to use our software as a cloud service or to deploy it on-premise. They can also choose from various pricing options including subscription and perpetual licensing and pricing based on the number of users or devices." The Company records revenues from software sales in either of two ways. First, the Company sells perpetual licenses along "with annual software support when deployed on-premise." Second, the Company sells "on a subscription basis as a cloud service or when deployed on-premise." According to the Company, as of the date of its June, 2014 initial public offering, "[t]he majority of our revenue to date has been sales of perpetual licenses of our

platform and related annual software support, with the subscription revenue being an increasing portion of our revenue."

27. With a perpetual contract, the customer purchases a license, and then pays an annual fee for services, software support, updates and technical support which are deployed on the customer's premises. The Company recognizes these fees immediately as revenue. Perpetual licenses thus provide MobileIron with the greatest upfront revenue.

28. Subscription contracts, too, are annual, but provide lower initial revenue, because, though the company bills the subscription in advance, it recognizes revenue ratably over the life of the contract, usually twelve months. Subscription services can be on the customer's premises, or cloud-based.

29. Another type of subscription contract is the cloud-based "monthly recurring charge" ("MRC"). MRCs are usually sold through "channel partners," MobileIron customers such as telecom companies who sell MobileIron services to their customers. The MRC contract is month-to-month, and the Company recognizes revenue monthly, rather than in advance. The number of active users or devices with MRC subscription contracts can fluctuate from month to month. MRC contracts provide the lowest amount of immediate revenue.

30. Even before its public offering on June 12, 2014, MobileIron was seeing a significant shift from perpetual licenses to subscription sales, including MRCs. The Company was fully aware of this shift long before the Class Period,

and fully aware that this shift was not a short-term blip, but rather a long-term trend. In its Quarterly Reports on Forms 10-Q for the period ending June 30, 2014, filed with the SEC on August 7, 2014 ("2014 2Q 10-Q"), and for the period ending September 30, 2014, filed with the SEC on October 31, 2014 ("2014 3Q 10-Q"), as well as in its Annual Report on Form 10-K for the year ending December 31, 2014, filed with the SEC on February 27, 2015 ("2014 10-K"), MobileIron repeatedly noted that "an increasing portion of our sales has been generated from subscription, including MRC."

31. Defendants also recognized the effect this shift would have on revenue recognition in the short term, stating in the 2014 2Q 10-Q, the 2014 3Q 10-Q and the 2014 10-K that "[t]his mix shift towards MRC and other subscription licensing, presents a number of risks to us. For example, arrangements entered into on a subscription basis generally delay the timing of revenue recognition and often require the incurrence of up-front costs, which can be significant." The Company continued that, "[s]ubscription revenues are recognized over the subscription period, which is typically 12 months. MRC revenue is recognized monthly on the basis of active users or devices and thus will fluctuate from month to month."

32. Defendants also knew that the shift towards subscription services meant that even if sales increased, revenues would not necessarily rise accordingly. As MobileIron repeatedly noted in its 2014 2Q 10-Q, 2014 3Q 10-Q and 2014 10-K, "[a]s a result, even if customer demand increases, our revenues will not increase

at the same rate as in prior periods, or may decline. Customers in a subscription arrangement," the Company disclosed, "may elect not to renew their contractual arrangement with us upon expiration, or they may attempt to renegotiate pricing or other contractual terms on terms that are less favorable to us."

33. A former employee ("FE1") who worked as a Vice President of Sales from 2009 until February of 2015, and reported directly to John Donnelly, the Vice President of Worldwide Sales, confirms the substance of MobileIron's public filings. He states that "we knew the trends were going more toward cloud and subscription sales. We knew eventually down the road it was going to be flip flopped in the opposite way that it [MobileIron] started."

34. As noted above, MobileIron sells a vast majority of its products indirectly, through channel partners, *e.g.*, telecom companies such as AT&T (its largest channel partner). According to the 2014 10-K, MobileIron had over 440 resellers of its products. Nevertheless, it assured investors that its own sales force "works closely with our channel partners to develop sales opportunities," supporting the notion that its sales projections were grounded in realistic, knowable goals and expectations.

35. MobileIron uses an internal computer program to track sales and sales opportunities called "Salesforce." Salesforce is a database that enables MobileIron to accurately track sales information for both new and prospective customers. It allows sales personnel to track the status of sale of new and/or additional services

("upsell") for current customers. Sales staff can enter information about sales leads, sales calls, the progress of potential sales, actual sales and sales that had vanished. Salesforce allows MobileIron and its executives accurately to track the status of sales, potential sales, and revenue within a region, nationwide, or worldwide.

36. Another Former employee ("FE2") served as an account manager for larger customers ("enterprise account manager") from July of 2013 until September of 2014. FE2 reported to John Chester, Regional Director of Sales for the East Coast. Chester (and later his replacement) reported to Eric Middleton, VP of sales for the East Coast, and Middleton in turn reported to John Donnelly, VP of Worldwide Sales. FE2 states that MobileIron required salespeople "frequently" and "constantly" to update not only consummated deals in Salesforce, but also potential sales opportunities. FE2 states that one of his duties was to forecast the dollar value of prospective deals and when a particular deal would close, information that he entered into Salesforce. He stated that, as an account manager, he was required to "keep Salesforce.com up to date with details about the deals" and "obviously it's my responsibility to accurately as I can forecast the dollar value of that deal and date that that deal would close."

37. FE2 reports that Company executives were able to see forecasts from all territories, and "they could accurately project what the revenue would be for the

quarter." Thus, senior executives were aware of when and over what period of time revenue would be recognized, even for potential sales.

38. FE2 states that Defendants Tinker and Ford "spent a significant amount of time every single day looking at Salesforce," noting that Salesforce is "primarily there for leadership." They paid "close attention" to the status of larger potential sales deals. Furthermore, both Tinker and Ford "actively" and "regularly involved themselves" in larger prospective sales that could have "a significant impact" on MobileIron's overall revenue, demanding frequent updates from FE2 and his sales staff.

39. According to FE2, Tinker sometimes personally met with customers' senior executives to assist in closing large sales deals. Thus, he had actual knowledge of the likelihood of whether a particular deal would be completed at all, the likely terms of that deal, whether a particular deal would even close in a particular quarter, and if there was revenue, when it would be recognized.

40. Defendant Tinker has admitted that he personally speaks with customers and handles sales calls. During a July 30, 2015 earnings call, he referenced handling sales calls, and the types of questions he receives, stating "I don't really get questions in sales calls about our financials."

41. According to FE2, Defendant Tinker's hands-on involvement with sales also manifested itself in a company-wide conference call he hosted once a

week during which Tinker spoke about large deals that closed, about MobileIron's standing vis-à-vis its competitors, and how sales personnel closed deals.

42. A third former employee ("FE3") also worked as an enterprise account manager at MobileIron, from December of 2012 to February of 2015. FE3 reported to Jason Pinkly, district Manager for South Central US Enterprise, SLED and Healthcare Sales. Pinkly reported to Jim Walsh, VP of North American Sales, who reported to John Donnelly, VP of Worldwide Sale. FE3 states that when salespeople inputted information about sales opportunities into Salesforce, which they were "required to" do, they were also required to note whether the deal was for a perpetual license, an annual subscription, or an MRC. Each of the three options had its own stock keeping unit ("SKU") number in the Company's Salesforce database. When a salesperson entered information into Salesforce to obtain a quote for a deal, and entered the SKU number, Salesforce calculated the revenue expected for that deal.

43. FE3 also added the "agreed upon plans for moving forward," and information concerning "what the project [was] about" into salesforce. FE3 states that the forecasts entered into Salesforce allowed company executives to run reports showing the revenue mix of sales opportunities at any given time, including how many were for perpetual licenses, annual subscriptions, or MRCs.

44. Still another former employee ("FE4") worked as a sales account manager for MobileIron from August of 2013 until March of 2015, reporting to

Michael Codair, the Regional Sales Director in New England. FE4 oversaw sales accounts and generated new sales for both very large and small businesses. FE4 states that he logged all sales opportunities and purchase orders into Salesforce at least once a week. He also participated in weekly conference calls to discuss forecasts with regional directors and Vice Presidents.

45. FE4 stated that MobileIron set "lofty" sales goals that were "unattainable." When he raised the issue of "impossible" sales goals with his superiors, his concerns "fell on deaf ears." FE3 concurred, saying that "it was tough" and "difficult" to meet the goals as they were set high.

46. Moreover, in late January, 2015 – before the beginning of the Class Period, but nearly one month into the first quarter of 2015 – FE4 attended MobileIron's annual "Global Sales Kickoff" in Los Angeles. MobileIron's entire executive team, including defendants Tinker and Ford, as well as the Company's entire sales team, attended the Sales Kickoff. At the time of the conference, FE4 states, MobileIron had lost some large deals in Q1 of 2015. In fact, FE4 states that the lost deals were "pretty substantial deals," and that this news was "the talk before and after the Global Sales Kickoff." Thus, by early February, 2015, Defendants had visibility on a material sales decline for the first quarter of 2015.

**The February 12, 2015 Conference Call**

47. MobileIron held an earnings conference call on February 12, 2015, the day before the first day of the Class Period and almost halfway through the first

quarter of 2015, in which both Defendants Tinker and Ford participated. During the call, Defendant Ford reiterated guidance from the press release for the first quarter of 2015 of $34-37 million in non-GAAP revenue and gross billings of $40-42 million. He did this despite knowing that the assumptions underlying that revenue forecast had drastically changed for the worse.

48. Defendant Ford noted that "this quarter, we are also seeing a substantially higher mix of subscription plus ratable billing driven by few large deals." Further, in response to a question from a Deutsche Bank analyst, he stated that "in Q1 we are seeing a much pronounced shift from perpetual licenses to subscription. ***We believe that is a Q1 phenomenon as many of our large companies have not yet established this cycle and are electing to subscription over perpetual.***" (emphasis added).

49. Thus, Defendants knew that many of the large clients whose deals MobileIron had expected to renew and upsell in the first quarter were choosing subscription services instead of perpetual licenses, which necessarily and undeniably meant lower recognized revenues in the first quarter of 2015 than MobileIron was forecasting. Even if all the expected sales deals closed before March 31, which was an untenable assumption by February 12, 2015, especially given the discussions at the Global Sales Kickoff, MobileIron would fail to reach its revenues forecast, because the increase in subscription and MRC deals meant that MobileIron could only recognize a fraction of the revenue from those deals in the

first quarter. If, on the other hand, those customers had signed perpetual license contracts, as MobileIron expected, all of the revenue would have been recognized in the first quarter.

50. Moreover, Defendants knew that in the environment existing on February 12, 2015, even subscription deals would be less lucrative to MobileIron than previously thought. As MobileIron stated in its 2014 2Q 10-Q, 2014 3Q 10-Q and 2014 10-K: “Customers in a subscription arrangement… may attempt to renegotiate pricing or other contractual terms on terms that are less favorable to us.”

51. Defendants Tinker and Ford both knew that MobileIron could not achieve its February 12, 2015 forecast, which was based on assumptions both already knew to be untrue as of February 12, 2015. As noted above, Tinker and Ford had daily, constant access to every detail of every prospective deal or customer renewal or upsell though the Salesforce program, including whether the sale or prospective sale was perpetual, subscription or MRC, and the expected revenue from each sale or prospective sale. Both Tinker and Ford were in the practice of meeting with their customers’ senior executives to help close large sales deals, the very customers who were not renewing their contracts and purchasing additional services, or, if they did sign new deals, were choosing subscription contracts that meant far less revenue in the short term for MobileIron.

52. In addition, news of the loss of large customers in the first quarter of 2015 was widely known. It was "the talk of" the January 2015 Global Sales Conference, attended by both Tinker and Ford.

53. Despite this knowledge, MobileIron falsely reassured analysts by withholding the impact of the failure to re-sign many large clients, and of those clients' moves from perpetual licenses to far less immediately lucrative subscription and MRC contracts. During the February 12, 2015 conference call, Defendant Ford told analysts that MobileIron would not change its forecast of expected revenues for the first quarter and still expected revenues to be $34-37 million. Addressing the drastic change in circumstance in the first half of the first quarter – changes that Ford had just admitted existed – Defendant Ford vigorously defended MobileIron's forecast, telling the analysts, and through them the investing public, that "[o]ur guidance incorporates the resulting impact to billings and revenue" of the move of large customers from perpetual to subscription licenses, and of the failure of many large clients to re-sign in the first half of the first quarter of 2015. He offered no explanation as to how this could possibly be true. As analysts and investors later learned, Defendants had no reasonable basis for his demonstrably false explanation.

54. MobileIron's February 12, 2015 revenue forecast had the desired effect. Based on Defendants' positive revenue projections, analysts continued to rate the Company's common stock a buy. For example, a Morgan Stanley analyst participated in the February 12, 2015 conference call. After hearing MobileIron

insist that changing conditions would not mean lower Q1 revenue, Morgan Stanley reiterated its rating of "overweight," its version of a "buy" recommendation. Similarly, Deutsche Bank's analyst reiterated his "buy" recommendation after the February 12, 2015 call.

55. As a result of its false outlook and nondisclosure and the subsequent positive analyses, investors remained unaware of the unavoidable bad news waiting for them at the end of first quarter.

**Defendants' False and Misleading Statements**

56. On February 12, 2015, MobileIron issued a press release in which it offered guidance for the first quarter of 2015. In that press release the Company projected that "total non-GAAP revenue is expected to be between $34 million and $37 million, and GAAP revenue is expected to be between $34.8 million and $37.8 million." Moreover, the Company stated, "total billings are expected to be between $40 million and $42 million"

57. On the same day, during an earnings conference call in which Defendants Tinker and Ford both participated, Defendant Ford falsely stated that "[o]ur guidance incorporates the resulting impact to billings and revenue," *i.e.*, the Company's guidance incorporated all changes and circumstances already observed in the first half of the first quarter, 2015.

58. The statements in the preceding two paragraphs were false for the following reasons:

(a) As described above, in detail, Defendant Ford, speaking on behalf of the Defendants, stated during the February 12, 2015 conference call that "this quarter, we are also seeing a substantially higher mix of subscription plus ratable billing driven by few large deals." Thus, Defendants knew that MobileIron's revenue forecast was false and incorrect, as they were aware that when a customer signed a subscription contract, only a fraction of the expected revenue could be recognized in the short term, while in perpetual licenses all of the revenue could be recognized up front. Moreover, they knew that in the environment existing on February 12, 2015, subscription deals would be less accretive to MobileIron than previously thought. As MobileIron had stated in its 2014 2Q 10-Q, 2014 3Q 10-Q and 2014 10-K: "Customers in a subscription arrangement… may attempt to renegotiate pricing or other contractual terms on terms that are less favorable to us."

(b) As described above, in detail, Defendant Ford, speaking on behalf of the Defendants, stated during the February 12, 2015 conference call that "in Q1 we are seeing a much pronounced shift from perpetual licenses to subscription. We believe that is a Q1 phenomenon as many of our large companies have not yet

established this cycle and are electing to subscription over perpetual." Thus, MobileIron knew that many of the large clients whose deals MobileIron had expected to renew and upsell in the first quarter were choosing subscription services instead of perpetual, which necessarily and undeniably meant lower recognized revenues in the first quarter of 2015. Even if all the expected sales deals closed before March 31, 2015 – an untenable assumption by late January, 2015, especially given the discussions at the Global Sales Kickoff, there was no way that MobileIron would reach its revenues forecast. Subscription and MRC deals meant revenues a fraction of those recognized in perpetual license deals. Moreover, Defendants knew that in the environment existing on February 12, 2015, even subscription deals would be less accretive to MobileIron than previously thought. As MobileIron had stated in its2014 2Q 10-Q, 2014 3Q 10-Q and 2014 10-K: "Customers in a subscription arrangement… may attempt to renegotiate pricing or other contractual terms on terms that are less favorable to us."

(c) All sales, prospective sales, and sales calls were entered in MobileIron's "Salesforce" program. Both Tinker and Ford "spent a significant amount of time every single day looking at

Salesforce," and thus knew the exact status of all potential sales deals or customer renewals. On February 12, 2015, therefore, Defendants already knew that the Company would not meet its first quarter forecast.

(d) Every potential sale was identified on Salesforce with an SKU number indicating whether it was perpetual, prescription, or MRC. Thus, Defendants knew for a fact that its revenues could and would not meet the February 12 forecast, and that the forecast was false.

(e) Defendant Tinker participated in sales calls and met with executives of large customers to close deals with those customers. He knew, therefore, which deals would close before the end of the quarter and which would not, and knew which clients would switch from perpetual to the far less immediately lucrative subscription contracts. Thus, Defendants knew that the February 12 forecast was false and unattainable.

(f) At MobileIron's annual "Global Sales Kickoff" in Los Angeles in late January of 2015, attended by MobileIron's entire executive team, including defendants Tinker and Ford, as well as the Company's entire sales team, news of the lost first quarter

> "substantial" deals was widely discussed, and was "the talk before and after the Global Sales Kickoff."

**The Truth Is Revealed**

59. On April 22, 2015, after the market's close, the Company issued a press release from Defendant Tinker entitled "MobileIron Announces Preliminary Financial Results for First Quarter of 2015." The Company significantly lowered its revenue guidance for the first quarter of 2015, as expected revenues had been vastly overstated. MobileIron announced that revenues would actually be only $32-33 million, instead of $34-37 million, while gross billings would be only $35.5-37 million, instead of the $40-42 million stated by Defendant Ford on February 12, 2015.

60. On an April 30, 2015 earnings conference call to discuss the disappointing first quarter numbers, Defendants conveyed their surprise at MobileIron's failure to meet its February 12, 2015 revenue forecast, even though both of the causes it claimed "surprised" it were known to MobileIron before the February 12, 2015 conference call, when the Company defiantly told analysts that it would still see $34-37 million in revenues.

61. First, the Company announced that it "saw a large shift by customers to our monthly subscription offering, which resulted in lower billings and revenue." During the April 30, 2015 earnings conference call, Defendant Tinker attempted to convince analysts that "the mix shift [of customers opting for perpetual vs.

subscription] turned out to be greater than expected, because new customers that came in Q1 skewed towards… our monthly subscription model." But of course it was not "greater than expected."

62. Defendant Ford had announced to these same analysts on February 12, 2015 that "this quarter, we are also seeing a substantially higher mix of subscription plus ratable billing driven by few large deals." Nor did Defendant Tinker mention on April 30, 2015 that the "large" subscription deals that he was seeing were of perpetual license customers switching to subscription services, with the resultant enormous loss in immediately recognizable revenue. Further, whether a customer was considering perpetual or subscription licenses and services was information entered into Salesforce for each customer or potential customer, and available to Company executives.

63. The poor quarter was not a result of "unmet expectations" and was certainly not a "surprise." Rather, it was the inevitable outcome based on facts that Defendants Tinker, Ford and MobileIron knew actually existed on February 12, 2015 when Ford falsely told the analysts that MobileIron's revenues would still meet its forecast.

64. Second, Defendant Tinker stated that "[n]ear the end of the quarter, we witnessed multiple large deals from North American customers that did not close as expected." Even leaving aside that Tinker and Ford had daily, constant access to every detail of every prospective deal or customer renewal or upsell through the

Salesforce program, and that both Tinker and Ford regularly met with senior executives to help close large sales deals, this outcome still was not a "surprise" to anyone at MobileIron. On the same day that MobileIron falsely told the investing public and the analysts that MobileIron would meet its revenue forecast, February 12, 2015, Defendant Ford told those analysts that "many of our large companies have not yet established this cycle and are electing to subscription over perpetual."

65. Furthermore, it was widely known throughout MobileIron's sales force that some large deals expected to close in the first quarter of 2015 had been lost, information that was widely disseminated at the Global Sales Kickoff event attended by MobileIron's entire executive team, including Defendants Tinker and Ford. MobileIron knew, therefore, that even if it managed to close deals with all of its enterprise customers before the end of the cycle, which was unrealistic given the information circulating among the sales force and executives, those deals would only bring in a fraction of the revenue MobileIron desired because only a fraction of the value of a subscription contract could be recognized in the first quarter of 2015. Defendant Tinker, therefore, was not "surprised" at a shift that MobileIron admitted already existed before the Company's dishonest February 12, 2015 projection.

66. In the wake of these revelations about first quarter revenues, Defendants disclosed still further troubling news on April 22, 2015, announcing

that Defendant Ford – the CFO – was leaving the company, effective upon the filing of MobileIron's 10-Q with the SEC for the first quarter of 2015.

67. The market reacted harshly to the news of MobileIron's first quarter revenue miss. On April 23, 2015, shares of MobileIron fell $2.39 per share, or over 25% from its previous closing price, and closed at $7.11 per share, greatly damaging investors.

68. Analysts similarly punished MobileIron for its deception, reducing their target prices for MobileIron's common stock across the board. Morgan Stanley changed the stock's rating from overweight (buy) to Equal-weight (hold). Noting that MobileIron offered "little explanation for the miss," Morgan Stanley slammed the Company for the lack of "transparency" in its "business model."

69. MobileIron's lack of transparency continues to this day. During the April 30th earnings conference call, Defendant Tinker referenced that larger perpetual license clients had failed to close deals in the first quarter, but neglected to mention that many such customers had switched to far less immediately lucrative subscription contracts. When a Stifel analyst asked him for the number of unclosed first quarter deals, Tinker simply refused to answer.

70. During that same call, when a Goldman Sachs analyst asked why the billings number was not higher if so many new clients signed subscription contracts (since non-MRC subscription contracts are billed in their entirety at the start of the

subscription), Defendant Tinker again simply refused to answer, pretending that the question had something other than its obvious meaning.

## ADDITIONAL SCIENTER ALLEGATIONS

71. Foundation Capital and its associated entities ("Foundation"), a venture capital firm, was an early institutional investor in MobileIron. Paul Holland, a General Partner at Foundation, became a "Board Observer" to MobileIron. Since well before the Company's June, 2014, initial public offering, Foundation and its associated entities owned more than 5% of MobileIron stock.

72. Foundation was also an institutional investor in a privately-held company called Averail Corporation ("Averail"), an enterprise mobile software company, developing a mobile content management solution for smartphones and tablets. The same Paul Holland, general partner at Foundation, sat on the Board of Directors of Averail.

73. In April of 2014, as MobileIron prepared its initial public offering, it completed the acquisition of Averail, with Foundation's assistance, in exchange for MobileIron common stock. On its website, Foundation states that it "helped scout [the] important acquisition." According to MobileIron's June 12, 2014 Prospectus, Foundation received over 103,000 shares of MobileIron common stock from the sale of Averail to MobileIron, the value of which was approximately $740,000.

74. Beyond promoting and facilitating seemingly conflict-ridden acquisitions, Foundation has also played an active role in MobileIron's operations.

On its website, Foundation states that Paul Holland and others from Foundation "made sales calls on behalf of John [Donnelly, MobileIron's VP of sales at the time] and his team." Donnelly is a friend and longtime former colleague of Holland's.

75. In the first quarter of 2015 – the quarter in which MobileIron misled analysts and the investing public about the first quarter revenue forecast – Foundation sold 1,060,356 of its shares of MobileIron, ***nearly 20% of the 5,477,705 MobileIron shares it owned*** as of December 31, 2014. MobileIron's average closing stock price in the first quarter of 2015 was $9.11 per share. On April 23, 2015, the first day of trading after the truth was revealed, MobileIron's stock closed at $7.11. Because Foundation sold over one millions shares of stock while the price was artificially inflated, Foundation avoided losses and profited by $2,060,712.

76. Given Foundation and Holland's close relationship with MobileIron, Foundation's sale during the Class Period is suspicious in timing and amount.

## NO SAFE HARBOR

77. MobileIron's "Safe Harbor" warnings accompanying its reportedly forward looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance

with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

78. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of MobileIron who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## LOSS CAUSATION/ECONOMIC LOSS

79. The market for MobileIron securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions as set forth above, MobileIron securities traded at artificially inflated prices during the Class Period. Lead Plaintiff and other members of the Class purchased or otherwise acquired MobileIron securities relying upon the integrity of the market price of MobileIron securities and market information relating to MobileIron, and have been damaged thereby.

80. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of MobileIron securities and operated as a fraud or deceit on Class Period purchasers of MobileIron securities by misrepresenting the value of the Company's business and prospects by providing guidance figures that were unrealistic. As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of MobileIron securities fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of MobileIron securities during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

81. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about MobileIron's business and operations. These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of MobileIron and its business and financial condition, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the

Class Period resulted in Lead Plaintiff and other members of the Class purchasing MobileIron securities at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the inflation in the price of MobileIron securities was removed and the price of MobileIron securities declined dramatically, causing losses to Lead Plaintiff and the other members of the Class.

## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

82. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired MobileIron securities traded on NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

83. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, MobileIron securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be

identified from records maintained by MobileIron or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

84. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

85. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

86. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of MobileIron;
- whether the Individual Defendants caused MobileIron to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of MobileIron securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,
- whether the members of the Class have sustained damages and if so, what is the proper measure of damages.

87. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

88. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- MobileIron securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on NASDAQ, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Lead Plaintiff and members of the Class purchased and/or sold MobileIron securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

89. Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

90. Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

91. At all relevant times, the market for MobileIron's common stock was an efficient market for the following reasons, among others:

(a) For all of the Class Period, MobileIron shares of common stock traded on the NASDAQ;

(b) As a regulated issuer, MobileIron filed periodic public reports with the SEC;

(c) MobileIron regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

(d) During the Class Period, the average weekly trading volume in MobileIron's shares was approximately 1.9 million shares. With a public float of approximately 25.9 million shares outstanding, approximately 13.6% of the float traded weekly, establishing a strong presumption that the market for its stock was efficient;

(e) New company specific information was rapidly reflected in the Company's stock price; and

(f) During the Class Period, as many as fifteen (15) market makers made a market in the Company's stock.

92. As a result of the foregoing, the market for MobileIron's common stock promptly digested current information regarding MobileIron from all publicly available sources and reflected such information in MobileIron's stock price.

Under these circumstances, all purchasers of MobileIron's common stock during the Class Period suffered similar injury through their purchase of MobileIron's common stock at artificially inflated prices, and a presumption of reliance applies.

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

93. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

94. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

95. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of MobileIron securities during the Class Period.

96. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for MobileIron securities. Lead Plaintiff and the Class would not have purchased MobileIron securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

97. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

98. The Individual Defendants acted as controlling persons of MobileIron within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, and their ownership of MobileIron securities, the Individual Defendants had the power and authority to cause MobileIron to engage in the wrongful conduct complained of herein. MobileIron controlled the Individual Defendants and all of the Company's employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY TRIAL DEMANDED**

Lead Plaintiff hereby demands a trial by jury.

Dated: September 28, 2015

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

and

**THE ROSEN LAW FIRM, P.A.**
Jacob A. Goldberg, Esq.
Gonen Haklay, Esq.
101 Greenwood Avenue, Suite 203
Jenkintown, PA 19046
Telephone: (215) 600-2816
Facsimile: (212)
Email: jgoldberg@rosenlegal.com
ghaklay@rosenlegal.com

***Counsel for Lead Plaintiff and the Class***

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2015, I electronically filed the foregoing ***Amended Class Action Complaint For Violation Of The Federal Securities Laws*** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Jacob A. Goldberg*
Jacob A. Goldberg
101 Greenwood Avenue, Suite 203
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
E-M: jgoldberg@rosenlegal.com

***Lead Counsel for Plaintiffs and the Class***